IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No. 07-cv-02415-WYD

IN RE THE MATTER OF:

ANDRÉS LIEBERMAN,

      Petitioner,

v.

JESSICA TABACHNIK,

      Respondent.

AND CONCERNING THE MINOR CHILDREN: L.L.T. (DOB 1994), D.L.T. (DOB 1996), AND E.L.T. (DOB 1998)

---

**ORDER**

---

      THIS MATTER is before the Court on Petitioner Andrés Lieberman's Petition for Return of Children to Petitioner Under the Hague Convention on the Civil Aspects of International Child Abduction and International Child Abduction Remedies Act, filed November 19, 2007. The Petition was filed pursuant to the Convention on the Civil Aspects of International Child Abduction ("Convention"), done at The Hague, Netherlands on October 25, 1980, 51 Fed. Reg. 10493, March 26, 1986, and federal legislation facilitating and implementing the Convention in the United States, the International Child Abduction Remedies Act, Public Law 100-300 at 42 U.S.C. 11601, et seq. Mexico is a party to the Hague Convention on the Civil Aspects of International Child Abduction. *In re B. DEL C.S.B.*, 525 F. Supp. 2d 1182 n.16 (C.D. Cal. 2007).

Petitioner alleges that the minor children L.L.T., D.L.T., and E.L.T. were wrongfully removed from their habitual residence of Mexico by their mother, Respondent Jessica Tabachnik, in violation of his custody and access rights. The Petitioner seeks the return of the children to Mexico. A hearing was held on the Petition for Return of Children on January 30, 2008.

At the hearing, the Petitioner, Respondent, court appointed counsel for the Respondent, both the Mexican counsel and American counsel for the Petitioner, and the court appointed Guardian *Ad Litem* were present. First, during the hearing, counsel for both parties presented arguments as to whether this Court has jurisdiction to return the minor children to Mexico. Then, Petitioner and Respondent presented evidence and called their respective witnesses. At some point during the evidentiary portion of the hearing, I concluded, with the consent of the parties and the Guardian *Ad Litem* that it was necessary to talk with the minor children in chambers. After careful deliberation, I decided, in the interest of creating a fair and accurate record of the proceedings, that L.L.T. and D.L.T. should testify on the record during the hearing. With the consent of the parties and the Guardian *Ad Litem*, L.L.T. and D.L.T. testified in the courtroom and were subject to cross examination by the parties. The youngest child, E.L.T. was deemed too young by me to testify in open court and he only spoke with me in chambers.

## I.     FACTUAL BACKGROUND

Petitioner Andrés Liberman and Respondent Jessica Tabachnik, both Mexican citizens, were married on March 21, 1993. Petitioner was employed by his family's real

estate and tobacco businesses and Respondent was a stay-at-home mother. Petitioner

and Respondent have three minor children from their marriage: L.L.T. who was born on

September 2, 1994; D.L.T. who was born on March 11, 1996 and; E.L.T. who was born

on March 4, 1998. Petitioner, Respondent and the three children resided in Mexico

until July of 2007.

The parties disagree on the date that the couple separated prior to divorce.

Petitioner claims that the couple separated on September 11, 2003. The Respondent

disagrees, and testified that the couple separated in November of that year. Both

parties agree that the couple was divorced by a divorce decree dated, January 26,

2004. Neither Petitioner nor Respondent provided background information or context

regarding why a Mexican court entered the order cited below. Upon the information

that has been provided, I believe that after receipt of notice that Petitioner opposed

Respondent removing the minor children, on June 23, 2004, a Mexican court entered

an order stating

> ...With the statements issued by the petitioner, a hearing must be allowed
> to JESSICA TABACHNIK ITZKOWICH in order that she states which may
> convene her, upon her right, notwithstanding the aforementioned and
> since the petitioner exercises the parental authority of the minor children,
> upon request and for the reasons indicated, official letter must be sent to
> the NATIONAL INSTITUTE OF EMIGRATION, to the SECRETARIAT OF
> THE INTERIOR and to the SECRETARIAT OF FOREIGN AFFAIRS in
> order to inform them that ANDRÉS LIBERMAN ZAJDMAN opposes to the
> fact that the minor children [L.L.T.], [D.L.T], AND [E.L.T.], all of them
> bearing the last names LIEBERMAN TABACHNIK, leave the country and
> he revokes any authorization requested to validate such leave.
> Therefore, such minor children can only leave the country through judicial

authorization.[1]

The above order restricted the Respondent from removing the children from Mexico without judicial authorization.

On April 18, 2007. Respondent filed the Incidental Proceedings for Amended Agreement for Change of Residence, seeking approval to change the residence of the minor children and herself.  On May 24, 2007, the United Mexican States, Superior Court of Justice of the Federal District, Judge 19th for Family Matters issued an Order stating that Respondent "shall be required thus within the term of THREE DAYS [to surrender] the passports, her passport and those of her minor children as well as the visa issued by the United States of America are exhibited, warning her that if she does not do so, she shall be imposed, as legal proceeding, a penalty equivalent to sixty days of general minimum wages in force in the Federal District..."  Despite the Court's order, the children were removed from Mexico by the Respondent in early July 2007.  The minor children and the Respondent now reside in Englewood, Colorado.

On November 19, 2007, Petitioner Andrés Lieberman filed, in this Court, a Petition for Return of Children to Petitioner Under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act, hereinafter referred to as "ICARA."  By Order dated November 26, 2007, Respondent was ordered to appear at a hearing scheduled for January 3, 2008, with

---

[1] Petitioner submitted translated copies of all of the orders cited within the Petition.  According to Petitioner, expert-translator Elizabeth Santamaria Rodriguez, certified by the Superior Court of Justice of the Federal District, has translated these orders.  I accept these translations as accurate translations of the original Spanish documents.

the minor children and with any passports and travel documents for the children for the purpose of arguing the merits of the Petition. In my Order, I prohibited Respondent from removing the children from the jurisdiction of this Court pending final disposition of the Petition. I further ordered that Respondent could appear with or without counsel, and that the failure to appear as ordered could result in an adverse ruling on the Application. Finally, I ordered the Petitioner to serve a copy of the Order and the Application on Respondent, and Respondent was ordered to file a response.

On December 4, 2007, Respondent filed a *pro se* Motion to Appoint Counsel, Motion to Appoint Guardian *Ad Litem*, and Motion for Restraining Order. By Minute Order, dated December 5, 2007, a motions hearing was set on the aforementioned motions for December 14, 2007. Petitioner filed a Motion for Leave for Testimony to be Taken by Contemporaneous Transmission from a Different Location on December 7, 2007. By Minute Order, dated December 12, 2007, Petitioner was granted leave to appear by contemporaneous transmission from a different location. On December 13, 2007, Petitioner filed a Response to Respondent's Motions.

At the December 14, 2007 hearing, Petitioner appeared by telephone and his counsel appeared in person. Respondent appeared *pro se* along with the three minor children. During the hearing, Respondent asserted that her children have been subjected to mistreatment and abuse by the Petitioner for years. She also alleged that the Petitioner had kidnaped the children in the past, had not fed them, and had exposed them to verbal and other forms of abuse while they resided in Mexico. Petitioner countered by explaining the circumstance of the divorce, professed love for

5

his children, denied that he had abused the children and described the kidnaping incident from his perspective.

By Order, dated December 19, 2008, I granted Respondent's Motion to Appoint Counsel and Motion to Appoint Guardian *Ad Litem*[2]. By way of the December 19, 2008 Order, the duties of the Guardian *Ad Litem* included, but were not limited to, the following: (1) to investigate all aspects of the social background of each of the minor children by talking to the Petitioner, Respondent, the minor children, reviewing court records from legal proceedings in Mexico and engaging in any further fact inquiry or investigation that the Guardian *Ad Litem* deems appropriate; (2) to investigate Respondent's allegations of abuse, mistreatment of each of the minor children for the purpose of determining if Respondent's allegations are accurate, truthful and verifiable; (3) to provide facts, evidence and recommendations, as to each child, concerning whether returning said child to Mexico would expose him or her to a grave risk of physical or emotional harm or otherwise subject the child to an intolerable situation; and (4) to investigate the wishes of the children and their respective maturity levels (to the extent that these issues relate to exceptions within ICARA) and make appropriate recommendations on this point.   Finally, I denied Respondent's Motion for a Temporary Restraining Order.

Pursuant to his report and testimony, the Guardian *Ad Litem* met with the

─────────────────────

[2] The December 19, 2007 Order appointed Attorney Frank L. McGuane, Jr. as counsel for Respondent and Attorney Vincent Nazir Rahaman as Guardian *Ad Litem* for the minor children.  On December 20, 2007, Attorney Rahaman filed his entry of appearance as Guardian *Ad Litem* for the minor children.  On December 21, 2007, Attorney McGuane, Jr. filed his entry of appearance as counsel for Respondent.

children on multiple occasions and filed his Report and Recommendation on January 29, 2008. In his report, the Guardian *Ad Litem* recommended that the Court find that the children were wrongfully removed from their country of habitual residence and that the Court find that Petitioner has rights of custody as defined by Mexican Law and the Treaty. The Guardian *Ad Litem* could not find any complaint against the Petitioner that would result in a grave risk of harm should one or all of the children be returned to Mexico. Nor could the children's therapist in Denver confirm that returning the children to Mexico would expose them to great risk of harm or any potential harm.

The Guardian *Ad Litem* expressed a concern about whether the children's wishes to return to Mexico were grounded in independence without influence by either parent. Specifically, in the Guardian *Ad Litem's* opinion, he stated that the children have been exposed to a "great deal of information and statements about their Father that has caused them to turn against him." The Guardian *Ad Litem* recommends that the children be ordered to return to their home country of Mexico. I find that I must give some deference to the Guardian *Ad Litem's* Report and Recommendations.

I also note that on January 28, 2008, Respondent filed with the District Court, Arapahoe County, Colorado, a Petition for Registration of Foreign Custody Determination.

## II.  ANALYSIS

"The Convention and ICARA serve, in part, to prevent parents from abducting children in order to avoid the jurisdiction of courts with rulings they do not (or believe they will not) agree." *Shealy v. Shealy*, 295 F.3d 1117, 1121 (10th Cir. 2002). "The

treaty and legislation seek 'to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'" *Id.* (quotation omitted). The scope of inquiry under the Convention "is limited to the merits of the abduction claim", not any underlying custody disputes. *Id.* (quotation omitted). "In a case arising under ICARA and the Hague Convention, the district court must determine whether the removal of a child was 'wrongful' under the definition as set forth in the Convention." *Id.* at 1121-22.

"The removal . . . of a child is wrongful where 'it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal. . . , where such rights were actually exercised by the parent seeking return of the child." *Id.* at 1122 (quoting Hague Convention, art. 3). "The petitioner bears the burden of showing by a preponderance of the evidence that the removal . . . was wrongful." *Id.* This requires a showing that: "(1) the child[ren] w[ere] habitually resident in a given state [in this case, Mexico] at the time of the removal. . . ; (2) the removal. . . was in breach of petitioner's custody rights under the laws of that state [Mexico]; and (3) petitioner was exercising those rights at the time of removal . . . ." *Id.*

Article 3 of the Hague Convention outlines when the removal or retention of a child is wrongful for the purposes of Article 12. Pursuant to Article 3:

The removal or the retention of a child is wrongful if:

a) it is in breach of rights of custody attributed to a person, an institution of any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or

8

retention; and

b) at the time of the removal or retention those rights were actually
exercised, either jointly or alone, or would have been so exercised but for
the removal or retention.

*Whallon v. Lynn*, 230 F.3d 450, 454 (1st Cir. 2000).  No wrongful removal exists without

the possession of custodial rights by the parent seeking the child's return.  *Gonzales v.*

*Guiterrez*, 311 F.3d 942, 948 (9th Cir. 2002).

If the petitioner establishes these elements "the authority concerned [the court]

shall order the return of the child forthwith" (Art. 12) unless certain exceptions under

Art. 13 and 20 can be established by the Respondent.  42 U.S.C. § 11603(e)(2).  These

exceptions include that: "1) the person requesting return was not at the time of the

retention or removal, actually exercising custody rights or had consented to or

subsequently acquiesced in the removal or retention . . . [which must be proved by a

preponderance of the evidence]; 2) the return of the child would result in grave risk of

physical or psychological harm to the child . . . [which must be proved by clear and

convincing evidence]; 3) the return of the child would not be permitted by the

fundamental principles of the requested State relating to the protection of human rights

and fundamental freedoms . . . [which must be proved by clear and convincing

evidence]; or 4) the proceeding was commenced more than one year after the

abduction and the child has become settled in the new environment. . . . [which must be

proved by a preponderance of the evidence]."  *Ohlander v. Larson*, 114 F.3d 1531,

1534 (10th Cir. 1997); 42 U.S.C. § 11603(e)(2).

The statutory exceptions are to be construed narrowly, since "[t]he Convention

establishes a strong presumption favoring return of a wrongfully removed child."

*Danaipour v. McLarey*, 286 F.3d 1, 13-14 (5th Cir. 2002). Defenses may not be used to

litigate the child's best interests", *id*. at 14, nor are they established by simply showing

that "*adjustment* problems that would attend the relocation of most children." *Friedrich*

*v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996). Finally, "a federal court retains, and

should use when appropriate, the discretion to return a child, despite the existence of a

defense, if return would further the aims of the Convention." *Id*.

A.     Whether the Petitioner Has Sufficient Rights of Custody

As an initial matter, I must determine whether the Mexican divorce decree

provides the Petitioner with a right of custody.[3]  Article 5 of the Hague Convention

distinguishes between "rights of access" and " rights of custody" for the purposes of the

Convention as follows:

> a) "rights of custody" shall include *rights relating to the care of the person of the child* and, in particular, the *right to determine the child's place of residence;*
>
> b) "rights of access" shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

Convention. Art. 5. Case law makes it clear that the remedy of return is solely for

violations of rights of custody. *Whallon,* 230 F.3d at 455. "The Convention does not

mandate a specific remedy when a noncustodial parent has established interference

with rights of access." *Bromley v. Bromley*, 30 F. Supp.2d 857, 860 (E.D. Pa.)(quoting

_____

[3] I do not need to discuss the threshold issue of whether the children were habitual residents of Mexico prior to their removal. The parties agree that the children's habitual place of residence is Mexico and that the children were removed by their mother from said residence.

*Viragh v. Foldes*, 415 Mass. 96, 612 N.E.2d 241, 247 (Mass. 1993)). "Without a breach of custody rights, the Convention cannot be invoked because removal cannot be considered 'wrongful.'" *Id.* "To vindicate the breach of access rights, the Convention authorizes signatory nations to use one or more remedies (short of return) to 'promote the peaceful enjoyment of access rights,' and to 'take steps to remove, as far as possible, all obstacles to the exercise of such rights.'" *Croll v. Croll*, 229 F.3d 133, 138 (2nd Cir. 2000)(quoting Convention, art. 21, 51 Fed. Reg. at 10,500).

Respondent argues that the Petitioner, under the terms of the divorce decree, has "rights of access" and not "rights of custody" as defined by the Hague Convention. Respondent asserts that she alone has rights of custody. Respondent argues that, in the alternative, even if Petitioner has rights of custody, he did not exercise those rights prior to the removal of the children.

Because the Respondent asserts that the Court lacks subject matter jurisdiction to hear this action, which implicates the nature of the Petitioner's parental rights and responsibilities, an analysis of relevant portions of the official translation of their divorce decree is necessary in making my determination. The divorce decree provides in part:

> FIRST. Both parties shall have the paternal authority of their minor children [L.L.T], [D.L.T], and [E.L.T.] bearing the last name LIBERMAN TABACHNIK. SECOND. Mr. ANDRÉS LIBERMAN ZAJDMAN and Mrs. JESSICA TABACHNIK ITZKOWICH agree that their three minor children shall be under the guard and custody of Mrs. JESSICA TABACHNIK ITZKOWICH, both during the proceeding and after the execution of the divorce.
>
> SIXTH. Mrs. JESSICA TABACHNIK ITZKOWICH can only change

her address within the Metropolitan Area of the Federal District.

FOURTEENTH.  Mr. ANDRÉS LIBERMAN ZAJDMAN and Mrs. JESSICA TABACHNIK ITZKOWICH agree that with the purpose of not modifying the current system of life and not affecting the emotional and cultural development of their children they shall continue with the educational system they currently have, at the school known as Colegio Hebreo Tarbut, and if a change occurs, this must be fully agreed by both parties, seeking at all moments and having a sole objective this benefit of their children.

FIFTEENTH.  Both parties in this agreement decide to solve and supervise in a continuous manner the education and cultural development of their minor children for which purpose they must inform each other with advance of any situation which may modify in any manner such evolution and likewise, both parents shall have access to participate in the scholar events, both of information and cultural as well as the grades and indications given by the school where they are developing their scholar activity.

EIGHTEENTH.  Both parties agree that Mr. ANDRÉS LIEBERMAN ZAJDMAN can take with him his three minor children on Tuesdays and Thursdays of each week from the hour of the coming out of the school where they are having the scholar studies and return them to their address at 20:30 hours.  However, he may see them any other day without affecting their scholar studies.[4]

TWENTY-SECOND.  In the case of travels abroad, both parents shall give their consent in order to leave the country indicating always the itinerary of the travel. [5]

Petitioner asserts that although the divorce decree states that the "guard and custody" of children rests with the Respondent, he also has custody rights under the terms of the divorce decree.  The *ne exeat* right combined with the couple's shared right to "solve and supervise in a continuous manner the educational and cultural

_____

[4] The divorce degree contains additional details on Petitioner's access rights including a division of the children's vacation time and holidays.

[5] Paragraph TWENTY-SECOND contains the *ne exeat* clause at issue in this case, the meaning of which is defined later in this order.

development of the children", creates a bundle of rights that constitutes a right of custody. Further, it is urged by the Petitioner that the doctrine of *patria potestas* vests in both parents a right of custody. Petitioner argues that within the divorce decree, where the Mexican court granted both parents parental authority, the court is allocating joint co-equal rights to both parties with respect to education, religion, cultural upbringing, and where the children reside.

With respect to the paragraph labeled SECOND in the divorce decree, the Petitioner asserts that the Mexican court's use of the term "custody" is what Colorado courts would define as "parenting time." Therefore, the paragraph labeled SECOND is essentially allocating principal parenting time to the Respondent. Petitioner contends that when examining the bundle of rights allocated in the divorce decree, Petitioner and Respondent essentially share rights that equate to what Colorado law defines as "decision-making" authority. Petitioner asserts that this reading of the divorce decree is apparent on the face of the divorce decree and is in accordance with Mexican law.

While the Petitioner did not provide me with a specific Mexican code provision to examine, the Petitioner's Mexican attorney did provide some testimony regarding the doctrine of *patria potestas* at the hearing. In response to Respondent's argument that the Petitioner only has rights of access under the Convention, Attorney Katz testified that *patria potesas* is the most sacred concept in Mexican family law. It is the binding relationship between a parent and their minor child until they become emancipated. Attorney Katz contends that what this means *per se* is that *patria potestas* gives the parents of the minor children the right to make every important decision in their lives

and the obligation to provide for them in every way.  Attorney Katz further testified that guard and custody in the divorce decree and in Mexican law refers only to living arrangements.

        1.     Terms of the Divorce Decree

Petitioner asserts that the divorce decree grants him a bundle of rights which equate to a right of custody under the Convention.  I will address whether Petitioner's claimed *ne exeat* right and *patria potestas* rights equate to a right of custody under the Convention later in my ruling.  First I will address, as an initial matter, whether rights of custody flow from the terms of the divorce decree.  Two clauses of the divorce decree were material in my reaching a determination on whether the divorce decree grants the Petitioner rights of custody.

The first clause, labeled as FOURTEENTH in the divorce decree, provides that Petitioner and Respondent "agree that with the purpose of not modifying the current system of life and not affecting the emotional and cultural development of their children they shall continue with the education system they currently have, ... and if a change occurs, this must be fully agreed by both parents...."  The second clause, labeled as FIFTEENTH in the divorce decree, provides that "[b]oth parties in this agreement decide to solve and supervise in a continuous manner the education and cultural development of their minor children for which purpose they must inform each other [in] advance of any situation which may modify in any manner such evolution and likewise, both parents shall have access to participate in the scholar events, both of informational and cultural as well as the grades and indication given by the school

where they are developing their scholar activity."

"[C]ustody of a child entails the primary duty and ability to choose and give sustenance, shelter, clothing, moral and spiritual guidance, medical attention, education, etc., or the (revocable) selection of other people or institutions to give these things." *Croll v. Croll*, 229 F.3d 133, 138 (2nd Cir. 2000). See also *Furnes* v. Reeves, 362 F.3d 702, 716 ("The right to determine a child's language, nationality, and cultural identity is plainly a right relating to the care and person of the child within the meaning of the Convention")(internal quotations omitted).

"In analyzing whether a parent has custodial rights under the Hague Convention, it is crucial to note that the violation of a single custody right suffices to make removal of the child wrongful. That is, a parent need not have "custody" of the child to be entitled to return of his child under the convention; rather, he need only have one right of custody." *Furnes*, 362 F.3d at 715. Further, he need not have a sole or even primary right of custody. *Id.* While many courts have placed particular emphasis on a parent's right to determine the child's place of residence when examining whether a parent has rights of custody, the Hague Convention also states that "rights of custody" shall include *rights relating to the care of the person of the child*.

Article 3 of the Convention states that removal of a child is wrongful if it breaches the custody of any person, even *joint custody*. In the Perez-Vera Report, the official commentary to the Convention, Elisa Perez-Vera states:

Now, from the Convention's standpoint, the removal of a child by one of

the *joint* holders without the consent of the other, is wrongful, and this
wrongfulness derives in this particular case, not from some action in
breach of a particular law, but from the fact that such action has
disregarded the rights of the other parent which are also protected by law,
and has interfered with their normal exercise. The Convention's true
nature is revealed most clearly in these situations: it is not concerned with
establishing the person to whom custody of the child will belong at some
point in the future, nor with the situations in which it may prove necessary
to modify a decision awarding *joint* custody on the basis of facts which
have subsequently changed. It seeks, more simply to prevent a later
decision on the matter being influenced by a change of circumstances
brought about through unilateral action by one of the parties.

Perez-Vera Report at 447-448 (quoted by 51 Fed. Reg. 10494, 10506)(emphasis
added).

Petitioner's joint right to solve and supervise in a continuous manner the
education and cultural development of the children combined with his joint right to
agree with or veto any educational modification endows him with consequential
decision-making authority over the children's day-to-day care. It is difficult to think of
one thing that affects a minor child, and care of that minor child, more than the
educational and cultural opportunities presented to that child.

Therefore, I find that sections FOURTEENTH and FIFTEENTH of the divorce
decree afford the Petitioner with rights of custody as defined by the Convention.
Respondent has by unilateral action modified the children's schooling and education.
By removing the minor children from Mexico, Respondent has removed the children
from the customary beliefs, social forms, and characteristic features of their every day
existence in Mexico which informed the children's cultural development. Respondent's
wrongful removal of the minor children has not only disregarded Petitioner's agreed

upon, and legally protected custody rights, but she has also greatly interfered with the normal exercise of the Petitioner's rights of custody.

### 2. Ne Exeat Right

A *ne exeat* clause is defined as an "equitable writ restraining a person from leaving, or removing a child or property from, the jurisdiction." BLACK'S LAW DICTIONARY (8th ed. 2004). The Tenth Circuit has not yet expressly decided the issue, but the majority of federal courts considering the issue has determined that a *ne exeat* order or statutory *ne exeat* provision do not accord rights of custody to a parent under the Hague Convention[6]. *Abbot v. Abott*, 495 F. Supp.2d 635, 638 (W.D. Tx. 2007) (citing e.g. *Fawcett v. McRoberts*, 326 F.3d 491 (4th Cir. 2003); *Gonzalez v. Guiterrez*, 311 F.3d 942 (9th Cir. 2002); *Croll v. Croll*, 229 F.3d 133 (2nd Cir. 2000)). Further, the majority of courts has held that the "right" granted under a *ne exeat* clause is, at most, a veto power. *Gonzales*, 311 F.3d at 949 (9th Cir. 2002)(quoting *Croll v. Croll*, 229 F.3d 133, 140 (2d Cir. 2000)). "A parent with custodial rights has the affirmative right to determine the country, city, and precise location where the child will live." *Id.* "By contrast a *ne exeat* clause serves only to allow a parent with access rights to impose a limitation on the custodial parent's right to expatriate his child." *Id.*

---

[6] See *Shealy v. Shealy*, 295 F.3d 1117 (10th Cir. 2002), the *ne exeat* clause in Shealy had an exception for military necessity; the Tenth Circuit held that the mother, who had applied for a transfer to the United States, had not wrongfully removed the child because the finding of military necessity by the district court was not clearly erroneous and therefore there was no breach of the *ne exeat* clause. In distinguishing *Shealy* for other cases, the court appeared to assume that a violation of an ordinary *ne exeat* clause would constitute a breach of "rights of custody" under the Convention. "If a military necessity did exist, then there was no violation of the *ne exeat* order, or, accordingly, of Mr. Shealy's custody rights under German law." *Id.* at 1123.

The foremost case on the issue of whether a *ne exeat* clause provides a right of custody under the Convention is *Croll v. Croll*, 229 F.3d 133, 140 (2nd Cir. 2000). In *Croll*, Mrs. Croll removed the minor child from Hong Kong to the United States in violation of her custody agreement with Mr. Croll. *Croll,* 229 F.3d at 135. Under the custody agreement issued by the Hong Kong court, the court granted Mrs. Croll sole "custody, care and control" of the minor child and granted Mr. Croll a right of "reasonable access." *Id.* The agreement also directed that the minor child was "not to be removed from Hong Kong until she attains the age of 18 years" without leave of the court or consent of the other parent. *Id.* Mr. Croll filed an ICARA petition seeking the return of the minor child to Hong Kong. *Id.* The district court held that the *ne exeat* clause created rights of custody and granted Mr. Croll's petition. *Id.* at 136. The Second Circuit majority reversed based on the following conclusions: (1) Mr. Croll's *ne exeat* right is not a right to determine the child's place of residence, but only a limitation on Mrs. Croll's right to determine the child's place of residence; (2) the *ne exeat* right cannot be exercised absent removal; and (3) the history and drafter's intent of Convention supported the view that a *ne exeat* right is not custodial. *Id.* at 137-143.

Judge Sotomayor dissented in *Croll* finding that a parent's *ne exeat* rights are within the category of custody rights the Convention seeks to protect. "The Convention states at its outset that its object is, along with returning children wrongfully removed from their habitual residence, 'to ensure that rights of custody . . . under the law of one Contracting State are effectively respected in the other Contracting States.'" *Croll*, 229 F.3d at 147 (Sotomayor, dissenting). "[T]he Convention's return remedy targets those

individuals who cross international borders, presumably in search of a friendlier forum,

flouting the custody law of the child's home country." *Id.* The dissent notes that

> [t]he Hague Convention provides a remedy not when a parent moves the child from city to suburb or from home to boarding school, but when he or she transports the child across national borders. In light of this international context, the term "place of residence," as used in the Convention, logically contemplates decisions regarding international relocation.

*Id.*

> The dissent opines

> In light of the Convention's broad purpose, the concept of wrongful removal clearly must encompass violations of ne exeat rights. When a parent takes a child abroad in violation of ne exeat rights granted to the other parent by an order from the country of habitual residence, she nullifies that country's custody law as effectively as does the parent who kidnaps a child in violation of the rights of the parent with physical custody of that child. Moreover, where, as here, the parent seeks a custody order in the new country, she seeks to legitimize the very action-removal of the child - that the home country, through its custody order, sought to prevent. To read the Convention so narrowly as to exclude the return remedy in such a situation would allow such parents to undermine the very purpose of the Convention.

*Id.* The dissent found that the *ne exeat* clause must include the "right to determine the

place of residence" because the clause gives a parent "decisionmaking authority

regarding a child's international relocation." *Id.* at 146.

The Court of Appeals for the Eleventh Circuit reached the opposite conclusion of

the *Croll* majority agreeing with the reasoning set forth in Judge Sotomayor's dissent in

*Croll*. *Furnes v. Reeves*, 362 F.3d 702 (11th Cir. 2004). In *Furnes*, the parties entered

into an agreement where "the parties would maintain joint parental responsibility for

their daughter under Norwegian law." *Id.* at 706. The term "joint parental

responsibility" used in the agreement had a specific designated meaning under The Norwegian Children Act. *Id.* Under the Norwegian Children Act, " a parent with joint parental responsibility" has the shared right "to make decisions for the child in personal matters." *Id.* at 714. The *Furnes* court determined that Furnes' *ne exeat* right must be considered in the context of his additional decision-making rights by virtue of his joint "parental responsibility under Norwegian law." *Id.* The court discusses at length the *ne exeat* right under Norwegian law being a right of custody under the Convention.

> The right to determine the place of the child's residence is just one example of a custody right under the Hague Convention. More generally, rights of custody include rights "relating to the care and the person of the child" Convention Art. 5. The *ne exeat* right under Norwegian law certainly establishes a right, no matter how minimally or expansively that right is defined, to affect the child's place of residence. As the Convention's definition of "rights of custody" implicitly acknowledges, the determination of the child's place of residence is a crucial aspect of the child's care. Thus, even assuming *arguendo* that Plaintiff Furnes does not have the right to *determine* Jessica's place of residence, he has at the very least a veto right *relating to* the determination of her place of residence - that is, a right "relating to the care of the person" of Jessica. Convention Art. 5. As such, the *ne exeat* right in § 43 provides Furnes with a right of custody over Jessica as defined by the Hague Convention.

*Id.* at 716. The court further explains how Furnes's *ne exeat* right operates as a right of custody under the Convention.

> ... Plaintiff Furnes's *ne exeat* right endows him with significant decision-making authority over the child's care. By requiring that Jessica remain in Norway, Furnes can ensure that Jessica will speak Norwegian, participate in Norwegian culture, enroll in the Norwegian school system, and have Norwegian friends. That is, Plaintiff Furnes effectively can decide that Jessica will be Norwegian. The right to determine a child's language, nationality, and cultural identity is plainly a right "relating to the care and person of the child" within the meaning of the Convention.

*Id.*

Additionally, the court in *Furnes* disagreed with *Croll's* reasoning that a *ne exeat* right can only be exercised to prevent a wrongful removal. "The problem with the majority's reasoning, in our view, is that [*Croll*] incorrectly assumes that a *ne exeat* right could only be exercised only to prevent a wrongful removal; it ignores the situation in which the custodial parent complies with the *ne exeat* clause and requests the non-custodial parent's consent to move the child abroad with the child." *Id.* at 720.

The *Furnes* court also found that creating rights of custody in a *ne exeat* right does not compel return of a child to a parent without previous responsibility or to an unfit parent because custody agreements or rights are not altered by return of the child. The *Furnes* court expressed the opinion that because the Convention is intended to prevent international child abduction, the *Croll* interpretation of the *ne exeat* right would have the opposite effect and thwart the intent of the Convention. *Id.* at 721.

The *Furnes* court also explains at length the effect of the Norwegian law on Mr. Furnes's rights, however, it is the court's thorough analysis of the Convention and its intent that is applicable to the case at hand. After careful review of the applicable case law and statutes, I find the reasoning of *Furnes* and the *Croll* dissent persuasive in aiding me in reaching a decision as to whether Petitioner's *ne exeat* right affords him a right of custody as defined by the Convention.

I find that Petitioner's *ne exeat* right constitutes a right of custody within the context of the Hague Convention. The Hague Convention was designed to provide a remedy after the removal of a child from the country of their habitual residence. The Convention is not concerned with where a child resides within the country of their

habitual residence. Thus, I find that the only logical construction of the term "right to determine place of residence" in the Convention must encompass decisions regarding whether a child may live outside of their country of habitual residence.

Here, Petitioner not only has the right to withhold consent to Respondent's moving abroad with the children, he also has the power to grant consent. In fact, Petitioner attempted to exercise his *ne exeat* right and that attempt is reflected in the June 23, 2004 order by the Mexican court. That order states that the Petitioner opposed the children leaving the country, and therefore the minor children can only leave the country through judicial authorization. Petitioner *ne exeat* right provides him with additional decision making authority over the children's care. By requiring the children remain in Mexico, Petitioner can ensure that the children participate in Mexican and Jewish culture, that they are enrolled in Mexican and/or Jewish schools, and that they have Mexican/and or Jewish friends.

        3.     Patria Potestas

Petitioner asserts that the concept of *patria potestas* affords him rights of custody as defined by the Convention. In *Whallon v. Lynn*, 230 F.3d 450 (1st Cir. 2000), the court explained the "Mexico code law" concept of *patria potestas*[7]. *Patria potestas* or parental authority, "is understood to mean the relationship of rights and obligations that are held reciprocally, on the one hand, by the father and mother or in some cases the grandparents and, on the other hand, the minor children who are not

---

[7]In *Whallon*, the Court is applying Baja California Sur Civil Code, which may or may not be similar to the civil code of Mexico City. The parties in this case provided no authority on the issue.

emancipated." *Id.* at 457 (quoting Codigo Civil del Estado de Baja California Sur ('Civil Code', art. 474). Further, the concept of *patria potestas* is defined broadly,

> Paternal authority is exercised over the person and the property of the children subject to it. The purpose of its exercise is the comprehensive physical, mental, moral and social protection of the minor child, and it includes the obligation for [the child's] guardianship and education.

*Id.* "The Code then distinguishes *patria potestas* from 'custody,' which may be decided by agreement or, failing such agreement, by a judge." *Id.* at 457.

Several courts have rejected the application of *patria potestas* where the couple has entered into a valid divorce or custody agreement, See *Gonzalez v. Gutierrez*, 311 F.3d 942, 954 (9th Cir. 2002)(holding that "*patria potestas* does not confer rights of custody upon the non-custodial parent where a competent Mexican court has already decided the rights and obligations of both parents"); *Ibarra v. Garcia*, 476 F. Supp. 2d 630, 635 (S.D. Tex. 2007)(holding "to the extent that Mexican law of *patria potestad* afforded plaintiff any right of custody of the child, plaintiff relinquished such rights in the agreed divorce decree").

However, in this case, I am not persuaded that when the Mexican court allocated custody rights in the divorce decree that Petitioner waived or relinquished his *patria potestas* rights. As noted in the divorce decree, "both parties shall have the *paternal authority* of their minor children." (emphasis added). Additionally, prior to the removal of the children the Mexican court entered an order on June 24, 2004, which states in part, ". . . since the petitioner exercises the *paternal authority* of the minor children, upon request and for the reason indicated. . . ANDRES LIBERMAN ZAJDMAN

oppose[d] [sic] [ ] the fact that the minor children. . . leave the country and he revokes any authorization requested to validated such leave." (emphasis added).

I find that the language of the divorce decree and the June 24, 2004 order indicate the existence of divisible custody rights – of physical custody and *patria potestas*, which is entirely consistent with the Convention's statement that custody may be held "jointly or alone". See *Whallon*, 230 F.3d at 457; *see also* Hague Convention, art. 3. I find that Petitioner's *patria potestas* rights are not mere access rights to the minor children. Attorney Katz's explanation of *patria potestas* and the above definition in *Whallon*, were persuasive in my finding. Petitioner's *patria potestas* rights provide Petitioner with a meaningful, decisionmaking role in the lives and care of the minor children. Such a finding is also consistent with my previous in depth discussion of Petitioner's rights as detailed in the divorce decree.

4. Petitioner Exercised His Rights of Custody

Having determined on the record before me that Petitioner has "rights of custody" under the Hague Convention, I must now determine whether Petitioner has shown that his rights were "actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Convention, Art. 3(b). "[A] person who had valid custody rights to a child under the law of the country of the child's habitual residence...cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007)(quoting *Friedrich*, 78 F.3d at 1066). "Further, once it determines the parent exercised custody rights in any manner,

24

the court should stop–completely avoiding the question whether the parent exercised the custody rights well or badly." *Id.*

In this case, Petitioner was exercising his joint parental authority prior to removal of the minor children. As stated above, Petitioner exercised his *ne exeat* right prior to the removal of the children. In addition, Petitioner was very involved in the selection of a school for L.L.T. So much so, that the Respondent testified in Court that Petitioner would not allow L.L.T. to change to an American school because he wanted her to attend a Jewish school. Respondent eventually petitioned the Mexican court in order to have L.L.T. attend the school of her choice.

Further, I find Petitioner's testimony credible that he attempted to attend the school and religious events of the minor children and that his attempts were rebuffed by Respondent. L.L.T. and D.L.T. testified about their father's repeated attempts to visit all three minor children at the school that they attended. The aggregation of these facts leads me to the conclusion that the Petitioner did not clearly and unequivocally abandon L.L.T., D.L.T., and E.L.T. Accordingly, I find that Petitioner exercised his "rights of custody" as required by Article 3(b) of the Convention.

B.    Respondent's Defenses to Petitioner's Claims

1.    Grave Risk of Physical or Psychological Harm

Respondent asserts that returning the children to Mexico will expose them to a grave risk of physical or psychological harm. The Sixth Circuit in *Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996), has indicated that the grave risk of harm can only exist in two situations. "First, there is a grave risk of harm when return of the child puts the

child in imminent danger prior to the resolution of the custody dispute e.g. returning the child to a zone of war, famine or disease." *Id.* at 1069. Second, there is a grave risk of harm in cases where there is "serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable of or unwilling to give the child adequate protection." *Id.*

A court may decline to repatriate a child if the party opposing repatriation establishes by clear and convincing evidence that repatriation would create a grave risk of physical or psychological harm to the child. See Hague Convention art. 13(g); *Blondin v. Dubois* 238 F.3d 153 (2nd Cir. 2001). To meet her burden of defense under Article 13(b) of the Hague Convention, the Respondent must show by clear and convincing evidence that there is a grave risk that returning the children to Mexico would expose them to physical or psychological harm or place the children in an intolerable situation. The "grave risk" exception is to be interpreted narrowly. *Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996). In making this determination, the following observation by the United States Department of Justice is particularly instructive:

> This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.

> A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually

abuses the child.  If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition.  Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

*Id.* (Quoting)(Public Notice 957, 51 FR 10494, 10510)(March 26, 1986).

In this case, Respondent testified in support of her defense that the Petitioner would only feed the children rice, beans, and tortillas when they would go to his house for visitation.  Further, she alleges that the Respondent would shout and get mad at the children.  The Respondent also alleges that she and the children have suffered years of abuse and are currently working with a domestic violence organization because they feel like victims and are constantly afraid of the Petitioner.  Respondent also argues that Mexico City is dangerous and Colorado is a much safer place to raise her children.  However, there is no evidence that the Petitioner has ever physically or mentally abused the children.  In addition, the Guardian Ad Litem found that the Respondent's allegations of abuse could not be substantiated.

I find that the Respondent failed to establish by clear and convincing evidence that the return of the children to Mexico would expose the minor children to physical or psychological harm or place them in an intolerable situation.  The allegations of the Respondent do not rise to the level of harm necessary to meet her burden.  Her defense under Article 13(b) therefore fails.

2.    The Views of the Children

The court may refuse to order the return of the child "if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is

appropriate to take account of its views [which must be proved by a preponderance of the evidence]." 42 U.S.C. § 11603(e)(2). Respondent must prove by a preponderance of the evidence through testimony or otherwise that the children are both of an age and maturity level for their views to be taken into account. *See England v. England*, 234 F.3d 268, 272 n. 5 (5th Cir. 2000).[8]

In making this determination, the court must consider the extent to which the "child[ren]'s views have been influenced by an abductor, or if the objection is simply that the child wishes to remain with the abductor." *In Re Nicholson*, 1997 WL 446432 (D. Kan. 1997). Application of the defense is within the court's discretion if the court

---

[8] There is no defined age at which the Convention considers children sufficiently mature enough for their views to be taken into account – it depends on the child. See *Blondin v. Dubois*, 238 F.3d 153, 166-67 (2nd Cir. 2001) (declining to hold as a matter of law that 8 year old girl was too young for her views to be taken into account, and holding that district court did not err in finding that 8 year old was mature enough to have her views taken into account); *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000) (declining to hold as a matter of law that 13 year old child is not mature enough, but affirmed district court's decision that the 13 year old at issue was not mature enough where she had four mothers in 12 years, had been diagnosed with ADD and had learning disabilities, and was scared and confused by proceedings); *Silverman v. Silverman*, 2002 WL 971808 at *10 (D. Minn. 2002), (determining, after judge took 10 year old child into chambers for an ex parte discussion, that 10 year old boy was of an age and maturity level at which views could be considered in connection with the defense involving a grave risk of harm to child – the court was "particularly impressed by his behavior in learning of the upcoming legal proceedings and his desire to express his views in a letter and have them considered"), aff'd, 312 F.3d 914 (8th Cir. 2002); *Mendez Lynch v. Mendez Lynch,* 220 F. Supp. 2d 1347, 1361 (M.D. Fla. 2002) (testimony showed that 9 year old boy had attained age/maturity at which it was appropriate to take into account his objections to returning to Argentina, but court "exercised its discretion" to return child to Argentina where "[h]is memories of Argentina are those of a six year old, he has been in the virtually exclusive custody of his mother in the United States since his removal from Argentina, and his mother has articulated a desire not to return to Argentina since almost the beginning of her arrival" in the United States).

believes that the child's preference is the product of undue influence over the child. *See Hazbun Escaf v. Rodriguez*, 200 F. Supp. 2d 603, 615 (E.D. Va. 2002) ("[t]he discretionary aspect of this defense is important because of the potential for undue influence by the person who allegedly wrongfully retained the child").

I find that the Respondent has not proved by a preponderance of the evidence that the children are of the age and maturity level for their opinions to be taken into account. At the January 30, 2007 hearing, all three of the minor children expressed their opinions regarding a return to Mexico during an *ex parte* meeting with me in chambers. After careful consideration of what they told me, I decided to allow the two oldest children, L.L.T and D.L.T, to testify in court under oath. Because L.L.T and D.L.T. expressed such strong views regarding their relationship with their father, I believed that it was important for them to testify on the record. L.L.T and D.L.T were questioned by me, the attorneys, and by the Guardian Ad Litem. This procedure was agreed to by the parties and the Guardian Ad Litem.

Both L.L.T. and D.L.T. expressed a strong desire to remain in Colorado with their mother. L.L.T and D.L.T. are normal children who seem to be coping well with an extremely difficult situation. However, like most normal children they are susceptible to suggestion and manipulation. Although both L.L.T. and D.L.T. were incredibly articulate in expressing their concerns and grievances regarding returning to Mexico, I believe that their mother's opinion of their father has influenced their evaluations of the situation. During their testimony, the words and phrases used to describe the situation with their father mirrored the testimony of the Respondent. Further, upon inquiry into

29

how the girls had come to form their opinions and whether the Respondent had any role in forming their opinions, both girls gave the exact same response. "I know because I lived it."

In addition, as stated at length above, in his report the Guardian *Ad Litem* expressed concern regarding whether the children's wishes are well grounded in independence and not subject to influence by either parent. Because I cannot be certain whether the opinions expressed by the minor children were their own or were the product of the influence of the Respondent, I find that the Respondent has not proven by a preponderance of the evidence that the minor children are of the age and degree of maturity necessary for me to take their opinions into account.

**III.     Conclusion**

For the foregoing reasons, it is

ORDERED that the Petition for Return of Children to Petitioner Under the Hague Convention on the Civil Aspects of International Child Abduction and The International Child Abduction Remedies Act, filed on November 19, 2007, is **GRANTED**. It is

FURTHER ORDERED that Respondent shall return the minor children, L.L.T., D.L.T., and E.L.T., to the country of Mexico not later than the end of the 2007-2008 academic school year for each minor child or by Monday, June 9, 2008, whichever date occurs first.

Dated:  April 10, 2008

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge